UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) ) ) |
| VS. | ) ) ) |
| ROBERT RAMOS, Defendant. | ) ) ) ) |

CRIMINAL ACTION NO.
MJ-03-907-MBB

# MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

The Defendant, Robert Ramos, submits the Memorandum of Law in support of his Motion to Dismiss.

## FACTS[1]

In September 2003 the government's cooperating witness (CW) contacted "law enforcement officers"[2] and told them that the Defendant, Robert Ramos, had asked for his help finding someone to murder the mother of his child (Female X). At the time, Mr. Ramos was a prison guard at the Bristol County House of Correction. This alleged solicitation happened within the Commonwealth of Massachusetts.

Mr. Ramos and the CW continued their discussions. On September 24, 2003 the two had a conversation on the telephone, during which Mr. Ramos told the CI that he had found someone in Miami who would commit the murder for "20," which the CW understood to mean twenty thousand dollars ($20,000.00). During this same conversation the CW told Mr. Ramos that he would commit the murder for "between 5 and 7," or

---

[1] The fact section is based on the affidavit of Special Agent Lisa Cline. See attached.
[2] The Defense has learned that the CI first contacted the FBI, not state officials.

-2-

between five and seven thousand dollars ($5,000.00 - $7,000.00). Mr. Ramos said that he could probably come up with five thousand dollars ($5,000.00).

On October 20, 2003 the CI and Mr. Ramos met in Rhode Island, in an apartment rented by the FBI. The meeting was videotaped. The two discussed the how the murder should take place, and Mr. Ramos provided the CW with details about Female X and the house where she and their child lived. Mr. Ramos allegedly told the CW that he didn't want investigators "to be able to link any of [our] phone calls to us." The CW told Mr. Ramos that "he would use different payphones to call *him*" [emphasis added].

The CW and Mr. Ramos had a telephone conversation on October 24, 2003, in which they discussed the price. Ramos offered to give the CW two thousand five hundred dollars ($2,500.00) as a down payment. He confirmed as well that the full price was five thousand dollars ($5,000.00). On November 13, 2003 there was another telephone conversation. The CW asked Mr. Ramos if he still wanted the murder done, to which Mr. Ramos responded yes, but that he would not have the two thousand five hundred dollars ($2,500.00) for another three weeks. Approximately three weeks later, on December 5, 2003, Mr. Ramos told the CW (on the telephone) that he had the money. The two arranged to meet on December 9, 2003 to make the transaction.

On December 9, 2003 Mr. Ramos called the CW and told him he was at the "designated meet location" in Providence, Rhode Island. The CW met Mr. Ramos and got into his car. Soon thereafter he got out, and Mr. Ramos drove off. The CW gave law

-3-

enforcement officers two thousand dollars $2,000.00 that Mr. Ramos allegedly gave him, and stated that he'd told Mr. Ramos that "it would be done within the next five (5) days."

**ARGUMENT**

1. The Federal Government Manufactured Jurisdiction in this Case

There is nothing about the crime of murder-for-hire itself that makes federal jurisdiction appropriate. It does not implicate obvious federal issues, nor does its commission necessarily entail some degree of interstate activity. It is a local crime, and as such is best left to state adjudication. This is especially true when, as here, federal agents turn what would otherwise be a state matter into a federal case by taking conscious steps to fabricate federal jurisdiction.

As stated in the fact section, the CW first approached federal law enforcement officials. He did not go to local police. When he did this there was no federal jurisdiction: he could report only that the Defendant had allegedly asked him about hiring someone to murder his ex-girlfriend, an event that happened entirely within the Commonwealth of Massachusetts. Instead of referring the case to local police, the F.B.I. instead went about

-4-

creating federal jurisdiction by arranging for Mr. Ramos to meet with the CW in Rhode Island.

The facts in this case are similar to those in United States v. Coates, 949 F.2d 104 (4th Cir. 1991). In Coates, the Defendant, Richard Coates, sought to have his brother-in-law killed. To that end he contacted a Julian York to arrange a murder-for-hire. York, it turned out, was a federal informer, who alerted county detectives about Coates's intentions. The detectives then notified federal agents, and the two agreed to work together.

They contrived a scheme in which a country detective was introduced to Coates as York's friend who would do the killing. Eventually the three decided that Coates would make a bomb and the detective would deliver it to the step-brother. York and the detective (unknown to Coates) then crossed the state line for the sole purpose of making an interstate call to Coates. The sole purpose of the call was to create federal jurisdiction under section 1958. Coates was then arrested and charged with the federal crime, and was later convicted.

The Court of Appeals overturned the conviction for lack of jurisdiction. The Court relied heavily on a 1973 Second Circuit case, United States v. Archer, 486 F.2d 670 (2nd. Cir. 1973), in which the Court reversed the Defendant's conviction under the Travel Act. The basis for the Archer Court's reversal was the same as in Coates, viz., "...because the telephone calls involved were 'manufactured by the government for the

-5-

sole purpose of transforming a local...offense into a federal crime." <u>Coates</u>, *supra*, at 106, quoting <u>Archer</u>, *supra*, at 681.

The <u>Coates</u> Court stated that the Travel Act, as it was analyzed in <u>Archer</u>, is "...directly analogous to sec. 1958..." <u>Coates</u>, at 106. Relying on the <u>Archer</u> decision's analysis of the legislative history of the Travel Act, the Court observed that in enacting the Travel Act "Congress...'did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure than an interstate element would be present. <u>Coates</u>, at 106, quoting <u>Archer</u>, *supra*, at 682. Based on that the Court reversed Coates's judgment, and in doing so observed, "[W]e emphasize the narrowness of our holding...We rely entirely on the fact that the *only* reason the sole jurisdictional link occurred here was that it was contrived by the government alone." <u>Id</u>.

In this case, there is no evidence that the Defendant was lured to Rhode Island for any reason other than to create federal jurisdiction. The Defendant was not indicted in Rhode Island. As mentioned above, all the participants in this matter - including the federal agents - were located in Massachusetts. And more pressingly, when the F.B.I. first received the information from the CW, it did not have jurisdiction. The Defendant had done nothing to invoke it, and it was only after the F.B.I. arranged the meeting in Rhode Island that it secured jurisdiction. In <u>Archer</u>, *supra*, the Court undertook a detailed analysis of the legislative history of the Travel Act (which the <u>Coates</u> Court observed was

-6-

"directly analogous" to sec. 1958). The analysis shed instructive light on the purpose and reasoning behind making certain crimes federal.

In construing the Travel Act, the <u>Archer</u> Court noted that it was created to facilitate the prosecution of organized crime, which often entailed "'...the 'top men' of a given criminal enterprise resid[ing] in one State but conduct[ing] their criminal operations in another." <u>Id</u>, at 679, quoting Hearing on S. 1653-1658, S.1665 before the Senate Judiciary Committee on the Attorney General's Program to Crush Organized Crime and Racketeering, 87th Cong. 1st Sess. (1961), at 15-17. Were there no federal jurisdiction local law enforcement officials would be limited to the prosecution of criminal activity in their given state, notwithstanding the interstate scope of the criminal enterprise. In this way the act allows local law officials to seek the assistance of federal authorities, and in so doing ensures the more efficient operation of the judicial system. <u>Archer</u>, at 679.

Implicit in this is the idea that in the absence of a meaningful interstate element local crimes are best left to local authorities. In overturning the Defendant's conviction under the Travel Act, the Court in <u>Archer</u> observed:

> Our holding is...that when Congress responded to the Attorney General's request to lend the aid of federal law enforcement officials in the prosecution of certain crimes, primarily of local concern, where the participants were engaging in interstate activity, it did not mean to include cases where the federal officers themselves supplied that interstate element and acted to ensure than an interstate element would be present. Manufactured federal jurisdiction is even more

-7-

offensive in criminal than in civil proceedings…As the late Judge Freedman said with respect to civil actions in <u>McSparran v. Weist</u>, 402 F.2d 867, 873 (3rd. Cir. 1968), manufactured jurisdiction 'is a reflection on the federal judiciary system and brings it into disrepute.'

"State and local governments have traditionally been primarily responsible for the regulation of crime -- particularly violent crime against individuals." Lieb, Christopher, *Dialing M for Murder: Assessing the Interstate Commerce Requirement for Federal Murder-For-Hire*, 2001 U Chi. Legal F (2001). Congress's awareness of this is apparent in the legislative history of the federal murder-for-hire statute. Congress described criteria to determine when jurisdiction should be asserted, stating

Federal jurisdiction should be asserted selectively based on such factors as the type of defendants reasonably believed to be involved and the relative ability of the Federal and State authorities to investigate and prosecute. For example, the apparent involvement of organized crime figures or the lack of effective local investigation because of the interstate features of the crime could indicate that Federal action was appropriate. S. Rep. No. 98-225 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3484.

In this case, the Commonwealth of Massachusetts has a particular interest in prosecuting the Defendant, who was a prison guard - an agent of the state who held a position in the administration of its laws. Public policy and a plain reading of sec. 1958 and the decisions which have interpreted it all show that dismissal for lack of jurisdiction is appropriate in cases (such as this one) where the federal government manufactures jurisdiction by consciously introducing an interstate element.

-8-

## CONCLUSION

Because the federal government manufactured jurisdiction, the Complaint should be dismissed

Respectfully Submitted,
For the Defendant,

Barry P. Wilson
LAW OFFICES OF BARRY P. WILSON
240 Commercial Street,
Suite 5A
Boston, MA 02109
617.248.8979
617.523.8700 (Fax)